IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. SAG-19-0585 |
| | * | |
| RICHARD ANTHONY GAYLE, | * | |
| | * | |
| Defendant | * | |
| | * | |
| ****** | | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO THE
DEFENDANT'S MOTION FOR REVIEW OF DETENTION ORDER**

COMES NOW the United States of America, by and through its undersigned counsel, and responds to the Motion for Review of Detention Order as follows:

1. On December 11, 2019, a federal grand jury in the District of Maryland returned an Indictment charging the defendant with conspiracy to distribute and possess with the intent to distribute 500 grams of cocaine, in violation of 21 U.S.C. § 846. Dkt. No. 15.

2. On January 29, 2020, a federal grand jury for the District of Maryland returned the Superseding Indictment charging the defendant with conspiracy to distribute and possess with the intent to distribute 400 grams or more of fentanyl, 1 kilogram or more of heroin, and 500 grams or more of cocaine, in violation of 21 U.S.C. § 846. Dkt No. 47.

3. On February 25, 2020, the defendant was arrested. *See* Dkt. No. 72.

4. On October 21, 2020, a federal grand jury for the District of Maryland returned a Second Superseding Indictment charging the defendant with conspiracy to distribute and possess with the intent to distribute 1 kilogram or more of heroin and 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846. Dkt. No. 169.

5. On April 22, 2020, United States Magistrate Judge Deborah L. Boardman held a detention hearing and issued an Order of Detention. Dkt. Nos. 119 and 120. The next day, Magistrate Judge Boardman issued a letter order regarding the same. Dkt. No. 121.

6. On October 29, 2020, the defendant filed a motion for review of the detention order under seal. Dkt No. 173.

7. The factors that a court must consider in determining whether a defendant poses a danger to the community and are a flight risk weigh in favor of detention.

8. These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person. . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the nature of the charges against the defendant, the Government is also entitled to a presumption that no combination of release conditions will assure appearance of the defendant and the safety of the community.

9. In this case, an examination of the § 3142 factors demonstrates that the detention order should remain in place.

10. The nature and circumstances of the offense factor weighs in favor of detention. The defendant is not an ordinary street level dealer, and his role in the charged offense was neither minor nor limited in its scope. Instead, the defendant was part of the nucleus of a drug trafficking organization ("DTO") that distributed kilogram quantities of heroin, fentanyl, and cocaine inside and outside of Maryland. Specifically, the defendant worked closely with the DTO leadership to pick up and transport kilogram quantities of narcotics. The defendant also distributed narcotics

and collected drug proceeds.  For instance, the co-defendant Tanicha Lewis ("co-defendant Lewis"), in vague, coded language, directed the co-defendant Shanna Peterson ("co-defendant Peterson") to pick 2 kilograms of cocaine from the defendant and provided the co-defendant Peterson with the contact information of the defendant to coordinate the co-defendant Peterson's pick-up of those narcotics.  The defendant provided the co-defendant Peterson with a specific address in New York to meet with the defendant.  The co-defendant Peterson picked up those narcotics from the defendant in New York on the evening of October 23, 2019.  In the wee hours of the morning on October 24, 2019, law enforcement seized 2 kilograms of cocaine during a traffic stop of the co-defendant Peterson, who was speeding in her vehicle in Maryland.

11.     Those 2 kilograms of cocaine were not the only narcotics intended for distribution that law enforcement seized during this investigation.  They also seized approximately 14 kilograms of fentanyl and 396 grams of heroin mixed with fentanyl.

12.     Investigators also seized proceeds from narcotics distributed during this conspiracy. For instance, on December 22, 2018, at approximately 9:58 a.m., California Highway Patrol officers conducted a traffic stop of a vehicle driven by the co-defendant Norman Alexander Moore ("co-defendant Moore") and rented by the co-defendant Curtis Gordon ("co-defendant Gordon"), who was in the passenger seat.  The vehicle was following another vehicle too closely while traveling southbound on the 15 freeway in southern California.  During that traffic stop, the co-defendant Moore consented to the search of the vehicle.  A trained and certified narcotics detection dog rendered a positive alert in the right and left rear floor areas of the vehicle. California Highway Patrol officers searched the areas to which the narcotics detection dog alerted and recovered vacuum-sealed plastic packages of cash, totaling $237,160.00, hidden under the carpet in those areas of the vehicle.  That seized cash was administratively forfeited on June 4, 2019.

13. The weight of the evidence for the charged offense also weighs in favor of detention. The Government's evidence includes cellphone extraction data, vehicle tracker data, and wiretap interceptions involving co-conspirators, including communications between co-defendant Moore—from whom law enforcement seized 9 kilograms of fentanyl from his vehicle in the wee hours of the morning immediately following the evening that the defendant and co-defendant Moore met in New York—and the defendant regarding narcotics and narcotics-related issues during the charged conspiracy based on investigators' training, knowledge, and experience. For instance, on November 22, 2019, the co-defendant Moore and the co-defendant Gordon in vague, coded language discussed the arrival of a narcotics shipment to New York. The co-defendant Moore in vague, coded language directed the co-defendant Gordon to coordinate with the defendant so the defendant could pick up that shipment from an unindicted co-conspirator. Later on the same day, the co-defendant Moore gave the defendant specific instructions: Go in the building; the guy works at the front desk; and ask if he talked with Curtis. Shortly after, the defendant did so and told the co-defendant Moore that he would call the co-defendant Moore back. About 20 minutes later, the co-defendant Gordon in vague, coded language followed up with the co-defendant Moore about whether the defendant had picked up the narcotics shipment; and co-defendant Moore confirmed in vague, coded language that the defendant had done so. Indeed, about an hour later, the defendant called the co-defendant Moore and, in vague, coded language, shared with the defendant the contents of the narcotics shipment. The co-defendant Moore asked the defendant, "How much in there?" The defendant confirmed in vague, coded language that there were at least six kilograms of narcotics.

14. The history and characteristics of the defendant factor similarly weighs in favor of detention. The defendant has used multiple aliases and has a substantial criminal history that

includes drug trafficking convictions and fraud claims (fraudulent documents, false claim to US citizenship, possession of forged instrument). In addition, he was deported twice from the United States with the last one in connection with his prior federal conviction for drug trafficking in this district. Moreover, the defendant has deep ties to Jamaica, and as a Jamaican national, the defendant could return back there to avoid trial for charges involving a mandatory minimum of 10 years with the maximum penalty of life imprisonment.

15. The defendant's physical condition is one factor to consider, but that factor does not weigh heavily, if at all, in favor of the defendant's release. The defendant has kidney failure, asthma, diabetes, and high blood pressure, but he does not allege that he has COVID-19 or he had contact with any individuals with COVID-19. Since August 1, 2020, there have been only 4 known positive cases of COVID-19 at CDF. This is in stark contrast to the rising cases in New York, the state in which the defendant's proposed placement outside of the facility is located.

16. The Maryland Department of Public Safety and Correctional Services has established a comprehensive set of precautionary measures to limit the risk of COVID-19 transmission into and inside CDF. For instance, detainees who are 50 or older are now with underlying medical conditions are being housed in a separate unit, detainees who are 50 years of age or more in the Protective Custody Unit are remaining in the Protective Custody Unit.

17. Contrary to the defendant's claims, CDF is implementing a plan that allows for social distancing, hygiene, and social distancing as follows: Each week, two bars of soap are issues to each detainee. If the detainee runs out of soap, he/she can request additional soap from the unit staff. While not in his/her cell, any detainee can request that their cell door be opened for handwashing or restroom use. DPSCS also is producing substantial quantities of sanitizer at a facility in Hagerstown, to ensure that it has an adequate supply. Moreover, CDF recently

completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish.  Signs and bulletins have been issued and posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently.  In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched.  Common areas are cleaned twice during all shifts. Brooms, mops/ buckets, Bleach solution, germicidal, window cleaner, and rags are routinely distributed daily on all shifts to individual units.  Gloves are provided to all sanitation workers.  In addition, CDF has acquired the services of ProtionPac to provide sanitation training and guidance to staff and prisoner sanitation workers.  Importantly, each Correctional Officer has received a sneeze guard (protective mask), a face shield, and gloves, and are required to wear them at all times.  Each detainee has also received two of his/her own sneeze guards.  A detainee can obtain another sneeze guard if necessary by requesting one from their unit staff.  Further, detainees have been informed through information bulletins to maintain a social distance of six feet, wash hands, wipe down areas in their housing units, and to sleep head to foot to increase distance between cellmates.  Currently, there are fewer than 300 detainees at CDF, which has the capacity to house nearly 600 detainees.  Each housing unit pod has the capacity for 24 detainees, but many currently are housing less.  For meals, detainees can opt to sit at tables but can choose to eat in their assigned cells.

18.     Moreover, there is no indication that CDF has not met or will not meet the defendant's needs.  Between the medical professionals at CDF and the medical professionals at the hospitals, the defendant has access to all of the care that he needs. *See United States v. Jones*, ELH-19-280 (D. Md.), ECF 220 (finding that at CDF "there are multiple points of access for detainees with chronic diseases to seek medical care, whether for routine or emergency needs,

6

including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses"). If the defendant needs treatment for asthma, diabetes, and high blood pressure, he will receive it. In the unlikely event that the defendant becomes infected with COVID-19, he will be quarantined, monitored, and receive any needed treatment, consistent with the CDC guidelines. And if the defendant needs specialized care for an unforeseen illness or injury, the medical staff at CDF will refer him to an outside professional. In short, there are sufficient resources, both inside and outside CDF, to ensure that the defendant's medical needs are addressed. Indeed, when faced with a motion for release based on COVID-19 of a defendant suffering from "diabetes, high blood pressure, asthma, and pain," Judge Grimm denied the motion for release without a hearing. *See United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Order by Judge Paul W. Grimm).

19.     The defendant's proposed placement outside of the facility does not eliminate the danger of the defendant contracting COVID-19. *See United States v. Gray*, GJH-19-407, ECF No. 120 (recognizing "the unfortunate reality that public health officials are struggling to contain the spread of the virus in the general public as well"). Multiple people are living in the residence. There is no indication that the defendant can self-quarantine or socially distance himself. As of the initial detention hearing, the defendant's sister is furloughed from the Marriott, but when she returns to work (if she has not already done so), she will work in an environment that could expose her to COVID-19 and, in turn, those living in the residence.

20.     Nor does electronic monitoring address the Government's concerns or eliminate the danger of the defendant contracting COVID-19. Electronic monitoring does not prevent others from coming to his sister's residence, which increases the risk of the defendant violating the law, as well as his exposure to COVID-19.

21. The nature and seriousness of the danger to the community in the event of the defendant's release factor further weighs in favor of detention. Although law enforcement has not seized firearms from his sister's residence in which the defendant lived or his vehicle—which law enforcement did not search—or the defendant's person, safety to the community has a broader construction. The legislative history of the Bail Reform Act reflects that "[t]he Committee intend[ed] that the concern about safety be given a broader construction than merely danger of harm involving physical violence." S. Rep. No. 225, 98th Cong. 2d Sess. at 12 (1984). The risk that a defendant will continue to sell narcotics was repeatedly cited in the legislative history as an example of a danger to the "safety of any other person or the community." *Id.* at 13. The current drug offense is not the defendant's first one. Even though the defendant has a prior federal drug conviction in this district, and the defendant was deported in connection with that conviction, the defendant still returned to drug trafficking. Accordingly, the risk of defendant returning to drug dealing is present here.

22. For the foregoing reasons, an examination of the § 3142 factors demonstrates that the detention order should remain in place, and the Court should deny the defendant's motion for review of detention order without a hearing.

23. To the extent that the Court grants the defendant's request, the Government requests that the Court stay its order setting conditions of release, so that the Government may appeal that order.

                                        Respectfully Submitted,

                                        Robert K. Hur
                                        United States Attorney

By: *Samika Boyd*
                                        Samika N. Boyd
                                        Assistant United States Attorney
                                        36 S. Charles Street, Fourth Floor
                                        Baltimore, Maryland 21201
                                        (410) 209-4800

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of November, 2020, that a copy of the foregoing **GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION FOR REVIEW OF DETENTION ORDER** was delivered to the CM-ECF system of the United States District Court for the District Court of Maryland for electronic delivery to Marshall Henslee, Richard Gayle's counsel.

*/s/ Samika Boyd*
Samika N. Boyd